UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:08-CR-90 |
| | ) | (VARLAN/GUYTON) |
| JEFFREY LYNN MATHIS, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This matter is before the Court on the defendant's Motion to Suppress

Evidence Under the Fourth Amendment of the United States Constitution [Doc. 30] and Motion to

Suppress Evidence Under the Fifth Amendment of the United States Constitution. [Doc. 32] On

January 14, 2009, the parties appeared before the Court for a hearing on the instant motions.

Attorney Hugh Ward, Jr. appeared on behalf of the government and attorney Kelly Johnson appeared

on behalf of the defendant, who was also present. At the close of the hearing, the defendant sought

leave of the Court to submit a post hearing brief, which the Court granted. The parties have since

filed their post hearing briefs. [Docs. 39, 42] However, in its post hearing brief, the government

raised for the first time the issues of standing and abandonment. The Court therefore allowed the

defendant extra time to brief those issues. [Doc. 45] The defendant filed his brief on the standing/abandonment issues on April 8, 2009, and the motions are now ripe for adjudication.[1]

The defendant moves the Court to suppress all evidence obtained by law enforcement from the December 17, 2006, search of the defendant's car and to suppress all statements made by defendant during his December 17, 2006, encounter with law enforcement. As grounds, the defendant states that the search of the car was performed without consent or a warrant, and that no exception to the warrant requirement applies to the search. The defendant further argues that the any statements made by the defendant were made without the proper <u>Miranda</u> warnings and without a knowing, intelligent, and voluntary waiver of those rights. The government opposes the motions, arguing that the search of the car was appropriate as a search incident to arrest, and that any statements made by the defendant were voluntary.

## I. Summary of Testimony

The government called Brian Baldwin ("Officer Baldwin"), the only witness to testify in this matter. Officer Baldwin testified that he was a police officer for the City of Knoxville with approximately four years of experience. [Doc. 38 at 4] Officer Baldwin is a patrol officer, assigned to the West District, and was on duty during the day shift of December 17, 2006. [<u>Id.</u>] Officer Baldwin testified that on December 17, he had an encounter with the defendant, Jeffrey Lynn

---

[1]For the record, the Court notes that on October 7, 2008, the United States Supreme Court heard oral argument in the case of <u>Arizona v. Gant</u>, 128 S. Ct. 1443 (2008), on the issue of whether the Fourth Amendment requires law enforcement officers to demonstrate a threat to their safety or a need to preserve evidence related to the crime of arrest in order to justify a warrantless vehicular search incident to arrest conducted after the vehicle's recent occupants have been arrested and secured. It is possible that the Supreme Court's ruling in <u>Arizona v. Gant</u> may, or may not, alter or reverse the jurisprudence the Court considered in reaching the instant decision. However, until the Supreme Court's decision issues, the Court can do nothing more than note that the decision is pending.

Mathis, Jr. ("Defendant"). [Id.] While traveling on Middlebrook Pike, Officer Baldwin noticed a maroon Caprice (the "Vehicle") with "fairly dark" tinted windows driving in the opposite direction. [Id. at 5] Officer Baldwin turned his patrol car around and attempted to catch up to the Vehicle, but the Vehicle pulled into the parking lot of the Dollar General Store at the corner of Middlebrook Pike and Western Avenue before the Officer caught up. [Id.]

Officer Baldwin testified that he pulled his patrol car into the parking lot of the Pilot gas station, across Middlebrooke Pike from the Dollar General, and waited for Defendant to exit the store. [Id.] While waiting for Defendant to exit, Officer Baldwin ran the plates of the Vehicle, which came back as belonging to Defendant. [Id.] Officer Baldwin then ran a check on Defendant, and found that Defendant was driving on a suspended driver's license. [Id.] Officer Baldwin indicated that the description attached to the report matched that of Defendant. [Id.]

Officer Baldwin testified that Defendant then exited the Dollar General Store with a few items he had purchased and headed toward the Vehicle. [Id.] Officer Baldwin indicated that he believed that Defendant observed the officer parked across the street. [Id.] Defendant then entered the Vehicle and pulled out onto Western Avenue. [Id.] Officer Baldwin pulled out of the gas station and pursued the Vehicle, but was delayed by traffic. [Id. at 5-6] Officer Baldwin observed the Vehicle turn off of Western Avenue and make a left onto Deaderick Avenue, but by the time the Officer turned onto Deaderick, he had lost sight of the Vehicle. [Id. at 6] Officer Baldwin continued driving down Deaderick and located the Vehicle parked at a house that was being renovated. [Id.] Officer Baldwin exited his patrol car to check if anyone was inside the Vehicle, but the Vehicle was locked and unoccupied.

3

Officer Baldwin testified that he recorded the events in question using his in cruiser video camera, and a DVD containing the relevant camera footage was entered into evidence as Exhibit 1. [Id. at 6-7]  Officer Baldwin described the window tint on the Vehicle as appearing to be "limo tint," a very dark type of window tinting used in limousines for privacy.  [Id. at 7-8]  Officer Baldwin believed that the tint on the Vehicle was darker than what was allowed under Tennessee law.  [Id. at 8]

Officer Baldwin testified that he contacted his beat partner and described Defendant to his partner.  [Id.]  Defendant was eventually located in a yard on Douglas Street.  [Id.]  Officer Baldwin explained that he had intended to stop the Vehicle, but was unable to do so.  [Id. at 9]  Portions of Exhibit 1 were then played for the Court.  Officer Baldwin further explained that the footage on Exhibit 1 begins at a point while the officers were looking for Defendant, who was believed to be on foot.  [Id.]

Officer Baldwin testified that the bag seen in the video footage at time stamp 10:23:42 contained the items Defendant had purchased from the Dollar General Store.  [Id. at 10]  Officer Baldwin indicated that Defendant told him that Defendant's cousin, Gregory Mathis, had been riding in the car with Defendant, but the officers did not locate anyone by that name.  [Id.]  Officer Baldwin did arrest Defendant, but did not initially advise Defendant of his rights because the officer had only asked Defendant basic questions.  [Id.]

Officer Baldwin testified that the rear end of the Vehicle is depicted in the bottom left of the screen at time stamp 10:30:16.  [Id.]  The Vehicle was not parked at Defendant's residence, but rather was parked at a home that was being renovated, the owner of which was unknown.  [Id. at 11]  Officer Baldwin testified that he searched the Vehicle and found approximately 36.7 grams of crack

4

cocaine in the on the back seat, wrapped in a jacket.  [Id.]  Officer Baldwin testified that when Defendant was asked who the crack belonged to, Defendant repeated that his cousin Greg Mathis had been in the vehicle.  [Id.]

Officer Baldwin testified that he latter attended a preliminary hearing, presumably of the Defendant, in Knox County court and that he offered testimony there similar to his testimony at the instant hearing.  [Id. at 11-12]  Officer Baldwin indicated that at the state court hearing, an individual by the name of Darrell Johnson testified.  [Id. at 12]  Officer Baldwin stated that Mr. Johnson testified at the state court hearing that he had been with Defendant on the day in question, but had slumped down, so Officer Baldwin did not see him, and left the area unseen.  [Id.]  Officer Baldwin indicated that Mr. Johnson also testified that the drugs Officer Baldwin found in the Vehicle belonged to Mr. Johnson.  [Id.]  Officer Baldwin testified that Mr. Johnson described the Vehicle as a white Buick, not a maroon Caprice.  [Id.]  Officer Baldwin stated that Mr. Johnson did not claim to be Gregory Mathis, and further stated that the Officer did not see anyone other than Defendant at the time in question.  [Id. at 13]  Officer Baldwin reiterated that he did arrest Defendant.  [Id.]

On cross-examination, Officer Baldwin testified that he initially intended to stop the Vehicle because of the window tint issue.  [Id.]  Officer Baldwin could not see inside the passenger compartment of the Vehicle, and he did not pull in behind the Vehicle when it pulled into the Dollar General Store.  [Id. at 13-14]  From the Pilot gas station, Officer Baldwin observed Defendant exit the Vehicle, though he did not know who Defendant was at that time.  [Id. at 14]  Officer Baldwin indicated that he could see Defendant clearly when Defendant exited the Vehicle to enter the store, including Defendant's hair and clothing.  [Id. at 14-15]  Defendant was in the store approximately

five to seven minutes, then exited the store, returned to the Vehicle, and pulled out onto Western Avenue.  [Id. at 15]

Officer Baldwin testified that he pulled out of the gas station onto Middlebrook Pike, but was delayed by traffic, and so could not immediately turn off of Middlebrook Pike onto Western Avenue. [Id.]  Officer Baldwin saw the Vehicle turn onto Deaderick Avenue, but lost sight of the Vehicle immediately afterwards.  [Id. at 16]  Officer Baldwin indicated that, because he lost sight of the Vehicle, he did not see anyone get out of the Vehicle after it had turned onto Deaderick and parked. [Id. at 16-18]  Officer Baldwin stated that the government's response to the suppression motions was inaccurate if it indicated that the officer saw Defendant exit the Vehicle and enter the home at which the Vehicle was parked.  [Id. at 18]  Officer Baldwin could not recall what Defendant was wearing when he exited the Dollar General Store, nor could he recall what his hair was like.  [Id. at 18-19]

Officer Baldwin testified that when he first found the Vehicle parked at the house, the officer parked his patrol car and approached the Vehicle.  [Id. at 19]  The Vehicle was parked off the street, was locked, and no one had complained to the officer about the Vehicle.  [Id.]  Officer Baldwin then returned to his patrol car and began to circle the block, but he could not recall how many times he circled the block, nor for how long.  [Id. at 19-20]  Officer Baldwin could not recall how long he had been parked at the point where the video footage on Exhibit 1 commences, nor could he recall how many times he had circled the block by that point in time.  [Id. at 20]

Officer Baldwin testified that he did attend the preliminary hearing in General Sessions Court on June 26, 2007, and that he had sworn to give truthful testimony at that hearing.  [Id. at 20-21] Officer Baldwin did not recall if he testified at the June 26 hearing that he had circled the block for three to four minutes.  [Id. at 21]  Officer Baldwin testified that after locating the parked Vehicle,

he next saw Defendant on foot, crossing Douglas Street, but that was not on video, and was before the other officers took Defendant into custody.  [Id.]

Officer Baldwin testified that the footage on Exhibit 1 begins with the officer parked across from the Department of Labor building, and then shows the officer driving to where he meets up with officers who had located Defendant.  [Id. at 21-22]  By the time when the footage on Exhibit 1 begins, Officer Baldwin had seen Defendant exit the Dollar General Store, had driven after Defendant, had located the Vehicle at the home off of Deaderick Avenue, and the officer had returned to his patrol car and begun to look for Defendant, but Officer Baldwin could not recall how much time had passed since he found the parked Vehicle.  [Id. at 22-23]

Officer Baldwin testified that beginning at time stamp 10:52:46, the video footage does show two officers escorting Defendant towards Officer Baldwin, and that one of the two officers appeared to have his hands on the back of Defendant's jacket.  [Id. at 24]  Officer Baldwin indicated that he was the officer who asked Defendant if Defendant had been driving a maroon Caprice.  [Id.]  Officer Baldwin testified that this was the first time he had seen Defendant since Defendant had parked the Vehicle off of Deaderick Avenue.  [Id.]

Officer Baldwin testified that when he learned that Defendant was driving on a suspended license, he radioed Officer Edmond Randolph ("Officer Randolph") for assistance.  [Id. at 25]  Officer Baldwin indicated that he described Defendant to Officer Randolph, but Officer Baldwin could not remember what description he gave.  [Id. at 25-26]  Returning to the point in time when the officers escorted Defendant to Officer Baldwin, beginning at time stamp 10:52:46, Officer Baldwin testified that he did ask Defendant if he had been driving a maroon Caprice, and that the officer had not Mirandized Defendant at that point in time.  [Id. at 26]  Officer Baldwin indicated

7

that by this point in time, he had decided to arrest Defendant. [Id.] Officer Baldwin stated that once he found out that the person being escorted by the other officers was Defendant, that confirmed that he had seen Defendant driving the Vehicle. [Id. at 26-27]

Officer Baldwin testified that he placed Defendant in the back of the patrol car and drove Defendant to the Vehicle. [Id. at 27] Officer Baldwin indicated that, because Defendant was not handcuffed, he did not believe that Defendant was in custody when Officer Randolph escorted the Defendant to Officer Baldwin. [Id.] Officer Baldwin indicated that the Vehicle was not finger printed, but he could not recall if the bag of crack was finger printed, nor could the officer recall if he cited Defendant for a window tint violation, nor could he recall what Defendant was wearing at the Dollar General Store. [Id. at 27-28] Officer Baldwin reiterated that when Officer Randolph escorted Defendant to meet Officer Baldwin, that was the first time he had seen Defendant after he found the parked Vehicle. [Id. at 28]

Officer Baldwin testified that it was his voice in the video at time stamp 10:54:58 that stated that "he threw me off because I came around, I saw somebody walking up the street, but when I saw him at the Dollar General Store he was in a white t-shirt and this dude had on a big old jacket and I was like I don't think it is him," but that he did not recall saying that, nor did he recall seeing someone walking around in a "big old jacket" while he was searching for Defendant. [Id. at 29] Officer Baldwin indicated that it was his voice at time stamp 10:56:56 that stated that "When I saw him at the Dollar General there he just had on a white t-shirt and I couldn't really see his haircut and I come up through here and I notice it's already parked and, [expletive deleted]. I turned around and come down this road and I saw a guy. It was basically him – it ended up being him – walking up

8

the street, and, that guy has got a big old jacket.  So I went down University and that is about the time Edmond got out with him and luckily ended up being him." [Id. at 30-31]

Officer Baldwin testified that the BOLO[2] he issued was based on what he saw Defendant wearing at the Dollar General Store, a white t-shirt and some sort of pants, but he could not recall the exact wording he used.  [Id. at 31-32]  Officer Baldwin agreed that any information the other officers had about Defendant's appearance and clothing would have come from Officer Baldwin. [Id. at 32]

On redirect examination, Officer Baldwin testified that Defendant had $1,580 in his possession at the time in question, as well as two telephones.  [Id. at 33]  Officer Baldwin indicated that the plates of the Vehicle came back as belonging to Defendant and showed as suspended. Officer Baldwin stated that Defendant told the officers that he was Jeffrey Mathis.  [Id.]  Officer Baldwin testified that asking someone their name and asking "were you driving that vehicle" are basic questions that would be asked at any traffic stop.  [Id. at 33-34]

On examination by the Court, Officer Baldwin testified that approximately at time stamp 10:23:49 he placed Defendant under arrest for driving on a suspended license.  [Id. at 35]  Officer Baldwin indicated that he was not sure exactly when he Mirandized Defendant, but it was at some point after the officers found the crack in the Vehicle.  [Id. at 35-36]  Officer Baldwin was not certain whether it was possible to hear the officers Mirandizing Defendant on Exhibit 1.  [Id. at 36]

## II.    FINDINGS OF FACT

The Court makes the following findings of fact.  On the morning of December 17, 2006, while on patrol, Officer Baldwin observed Defendant driving the Vehicle, and noticed that the

---

[2]BOLO stands for "be on the lookout."

windows of the Vehicle had what appeared to be "limo" tint.  Before this incident, Officer Baldwin had no prior knowledge of Defendant.  The Vehicle pulled into the parking lot of the Dollar General Store at the corner of Middlebrook Pike and Western Avenue, and Officer Baldwin pulled into the Pilot gas station across Middlebrook Pike from the Dollar General Store.  Defendant exited the Vehicle and entered the Dollar General Store.  Officer Baldwin ran the Vehicle's license plate while waiting for Defendant to exit the store.  By checking the Vehicle's tags, Officer Baldwin determined that the Vehicle was registered to Defendant, and was then able to determine that Defendant's driver's license was suspended.  In checking Defendant's record, Officer Baldwin was also able to determine that the individual he observed exiting/entering the Vehicle matched the general physical description returned by his investigation of Defendant's record.  Upon learning that Defendant had a suspended license, Officer Baldwin radioed for backup and described Defendant.

Officer Baldwin observed Defendant exit the store and return to the Vehicle.  Officer Baldwin also observed that Defendant was carrying items he had purchased in the store.  The Vehicle then pulled out of the Dollar General Store onto Western Avenue.  Officer Baldwin followed the Vehicle, but because of traffic, was not able to catch up to the Vehicle before the Vehicle turned off of Western Avenue onto Deaderick Avenue.  Officer Baldwin saw the Vehicle turn onto Deaderick Avenue, but by the time the officer turned onto Deaderick, he had lost sight of the Vehicle.  Officer Baldwin proceeded down Deaderick Avenue and found the Vehicle parked at a house that was being renovated.  Officer Baldwin checked the Vehicle and found that it was locked and unoccupied.  After finding the empty Vehicle, Officer Baldwin began circling the neighborhood, looking for Defendant.  At the same time, at least one other officer, Officer Randolph, was also searching the area for Defendant.

10

At some point after locating the empty Vehicle, Officer Randolph located Defendant and radioed Officer Baldwin of Defendant's location. At the time of the hearing, which was approximately two years after the incident, Officer Baldwin was unable to recall how many times he circled the block while searching for Defendant, nor how much time passed between when Officer Baldwin found the empty Vehicle and when Officer Randolph located Defendant. However, based upon the on statement of Officer Baldwin on Exhibit 1 that "When I saw him at the Dollar General there he just had on a white t-shirt and I couldn't really see his haircut and I come up through here and I notice it's already parked and, [expletive deleted]. I turned around and come down this road and I saw a guy. It was basically him – it ended up being him – walking up the street, and, that guy has got a big old jacket. So I went down University and that is about the time Edmond got out with him and luckily ended up being him," the Court finds that only a short period of time elapsed between when Defendant left the Vehicle and when he was located, a period of approximately five minutes. [Exhibit 1 at time stamp 10:56:56 through 10:57:21]

Based on that same statement, the Court also finds that after Officer Baldwin found the empty Vehicle, and before Officer Randolph located Defendant, Officer Baldwin drove by Defendant, who at that time was on foot, without recognizing him, despite Officer Baldwin's otherwise contradictory testimony. [Compare Doc. 38 at 21 (indicating that Officer Baldwin saw Defendant crossing the road prior to being in police custody) with Doc. 38 at 24, 28 (indicating that the first time Officer Baldwin saw Defendant after he located the empty Vehicle was when Officer Baldwin met up with Officer Randolph and Defendant, as depicted in Exhibit 1)] However, given the two year period between the hearing and the events in question, the Court does not find Officer Baldwin's contradictory testimony on this issue to have rendered his entire testimony incredible.

11

<u>See</u> <u>Nash v. United States</u>, No. 03-6630, 2004 WL 2912796 (6th Cir. Dec. 16, 2004) (holding that minor potential inconsistencies and memory lapses did not render a witness' testimony incredible).

After Officer Randolph located Defendant, Officer Baldwin drove to Defendant's location, as depicted on Exhibit 1, at which point Officer Randolph and another officer escorted Defendant through what appears to be the yard of a residence. While escorting Defendant, Officer Randolph had his hands on either Defendant's arm or jacket and Defendant was not free to leave. Officer Baldwin then asked Defendant if he was driving the Vehicle, and asked why Defendant parked "at that house and got out." Defendant acknowledged to the officers that he was Jeffrey Mathis. Defendant was not advised of his Miranda rights before being asked about the Vehicle and his identity.

Officer Baldwin directed Defendant to place his hands on the officer's patrol car and then searched Defendant. Shortly thereafter, at approximately time stamp 10:23:49, Officer Baldwin placed Defendant under arrest for driving on a suspended license, put Defendant in the back of the patrol car, and then drove back to the Vehicle. Officer Baldwin searched the Vehicle and discovered a quantity of crack cocaine in the back seat. Officer Baldwin obtained neither a warrant, nor Defendant's consent, prior to searching the Vehicle. Except for the discrepancies noted above, the Court finds Officer Baldwin's testimony to be credible.

## III.    POSITIONS OF THE PARTIES

Defendant moves the Court to suppress all statements made by Defendant and all evidence recovered from the Vehicle. As grounds, Defendant argues that he was not Mirandized prior to being asked to confirm his identity and to confirm that he was driving the Vehicle. Defendant contends that such interrogation was custodial in nature, that Miranda warnings were required, and

therefore that any statements made by Defendant should be suppressed. With respect to the evidence recovered from the Vehicle, Defendant argues that the warrantless search of the Vehicle was improper, because Defendant was approximately two blocks away from the Vehicle when he was placed under arrest, and that it was unreasonable for the officers to search the Vehicle incident to the arrest. Defendant further argues that the evidence obtained from the Vehicle should also be barred as fruit of the poisonous tree, because the evidence in the Vehicle was only obtained as a result of the allegedly unlawful custodial interrogation of Defendant.

The government opposes Defendant's motions, arguing that the questions asked of Defendant were limited to those necessary to identify Defendant, and thus were appropriate. The government further argues that the search of the Vehicle was proper incident to Defendant's arrest and that the defendant abandoned the Vehicle, and therefore had no standing to challenge the search.

## IV.    ANALYSIS

### A.    Motion to Suppress Statements [Doc. 32]

The Court first addresses Defendant's Motion to Suppress Statements. The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

However, <u>Miranda</u> does not apply to all types of detention. Courts have recognized that <u>Miranda</u> does not apply to an investigative detention, otherwise known as a <u>Terry</u> stop. In addressing this issue, the Sixth Circuit has held that:

> the very nature of a <u>Terry</u> stop means that a detainee is not free to leave during the investigation, yet is not entitled to Miranda rights. Therefore, the pertinent question is whether [the suspect] was "in custody" during the investigatory detention for the purposes of determining whether his Fifth Amendment rights were violated.

> In determining whether a defendant was subject to custodial interrogation we look to the totality of the circumstances "to determine 'how a reasonable man in the suspect's position would have understood the situation.'" The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."

<u>United States v. Swanson</u>, 341 F.3d 524, 528-29 (6th Cir. 2003). Relevant factors to consider in such a situation include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or acquiesced to their requests to answer some questions. <u>Id.</u> at 529.

In the instant case, there is no question that Defendant was placed under arrest after he confirmed his identity and the fact that he was driving the Vehicle. The question before the Court, then, is whether the period between when Officer Randolph detained Defendant and the point when Defendant confirmed his identity and association with the Vehicle, rose to the level of custodial interrogation. After weighing the factors described above, and after considering the totality of the circumstances, the Court finds that Defendant was not under arrest during that time, that the

14

questioning did not rise to the level of custodial interrogation, but instead that Defendant was being held in an investigative detention.

The first factor, the purpose of the questioning, weighs in favor of a finding of investigative detention, because the officers restricted themselves to asking Defendant identifying questions limited to the scope necessary to resolve their suspicion that criminal activity was afoot, and the questioning was otherwise unobtrusive. The second factor, whether the questioning was hostile or coercive, also weighs in favor of a finding of an investigative detention, as there is no evidence of hostile or coercive behavior on the part of the police. The third factor, the length of the questioning, also weighs in favor of an investigative detention, as the officers detained Defendant for only a short period of time, the amount of time necessary for Officer Baldwin to quickly drive to Defendant's location and ask Defendant whether he was driving the Vehicle.

The fourth factor, other indicia of custody, weighs against a finding of an investigative detention, as Defendant clearly was not free to leave, given that Officer Randolph physically escorted Defendant to Officer Baldwin, who then began to frisk Defendant. However, the Sixth Circuit has recognized that "the very nature of a Terry stop means that a detainee is not free to leave during the investigation, yet is not entitled to Miranda rights." Swanson, 341 F.3d at 528. Accordingly, the presence of that factor alone is insufficient to support a finding of custodial interrogation. Rather, the Court finds under the totality of the circumstances that the short period of questioning leading up to Defendant's arrest, more specifically, the period of time between when Officer Randolph located Defendant to the point in time depicted at time stamp 10:23:49 on Exhibit 1, constituted an investigative detention, as governed by Terry v. Ohio, 392 U.S. 1 (1968), not a custodial interrogation, and therefore Miranda warnings were not required.

Given that the statements in question occurred during a custodial investigation, and not after Defendant's arrest, <u>Miranda</u> warnings were not required, and their absence does not require the suppression of Defendant's statements. Therefore, the Court **RECOMMENDS** that Defendant's Motion to Suppress Statements [Doc. 32] be **DENIED**.

**B.     Standing**

As the Court noted above, in its post hearing brief, the government raised for the first time the issues of standing and abandonment, arguing that Defendant abandoned the Vehicle, and therefore lacked standing to challenge the search of the Vehicle. Defendant disagrees, arguing that he did not abandon the Vehicle and that he has standing to challenge the warrantless search of the Vehicle.

To contest the admissibility of physical evidence obtained in a warrantless search, a person must have a legitimate expectation of privacy in the items or area searched. <u>See</u> <u>United States v. Knox</u>, 839 F.2d 285, 293 (6th Cir. 1988). A legitimate expectation of privacy incorporates two elements: (1) whether defendant exhibited an actual subjective expectation of privacy, and (2) whether the defendant's subjective expectation is "one that society is prepared to recognize as reasonable." <u>Id.</u> (quoting <u>United States v. Tolbert</u>, 692 F.2d 1041, 1044 (6th Cir. 1982)).

The Sixth Circuit has held that a defendant lacks the requisite standing to challenge a warrantless search of a vehicle when the defendant flees the scene, leaving behind an unlocked, unoccupied vehicle. <u>United States v. Harris</u>, No. 94-5857, 1995 U.S. App. LEXIS 5491, at *6-7 (6th Cir. Mar. 15, 1995); <u>United States v. Grecni</u>, No. 90-3483, 1991 U.S. App. LEXIS 18108, at *9 (6th Cir. July 30, 1991). However, both <u>Harris</u> and <u>Grecni</u> are distinguishable from the facts of the instant case. In <u>Harris</u>, the defendant fled the vehicle **after** being pulled over by the police during

a traffic stop. Harris, 1995 U.S. App. LEXIS 5491, at *3. Similarly, in Grecni, the defendant fled

his vehicle after a high speed chase by the police. Grecni, No. 90-3483, 1991 U.S. App. LEXIS

18108, at *4. Thus in both cases, the defendants were well aware that the police wished to speak

with them when they left the vehicles, and in both cases the vehicles were left unlocked.

In the instant case, there is no evidence that Officer Baldwin activated his police lights and

siren or otherwise provided Defendant notice that the Officer sought to pull him over. Officer

Baldwin did testify that he thought that Defendant noticed Officer Baldwin parked across the street

when Defendant exited the Dollar General Store. However, even if Defendant did notice the officer

parked across the street at the gas station, such a fact would be insufficient to place Defendant on

notice that Officer Baldwin sought to speak with him. Without some evidence that Defendant was

aware that the police sought to question him, there is no evidence that Defendant fled from the

police. Additionally, given that when Officer Baldwin found the Vehicle it was locked, was parked

off of the street at a residence, and was not blocking traffic, coupled with the fact that Defendant was

in possession of the Vehicle's keys when he was detained by the police and admitted to being the

person who was driving the Vehicle, there is absolutely no evidence that Defendant abandoned the

Vehicle.

Without some evidence that Defendant was fleeing from the police and had actually

abandoned the Vehicle, the Court will not find that Defendant had given up his expectation of

privacy in the Vehicle. To do otherwise would allow the police to search any lawfully parked

vehicle at any time, and the Court knows of no jurisprudence which would authorize such police

action. Instead, the Court finds that Defendant exhibited an actual subjective expectation of privacy

in his locked, parked Vehicle, and also finds that Defendant's subjective expectation is "one that

society is prepared to recognize as reasonable." Accordingly, the Court finds that Defendant did not abandon the Vehicle and thus has standing to challenge the warrantless search at issue.

### C.    Motion to Suppress Evidence [Doc. 30]

Having resolved the standing issue, the Court turns to the merits of the defendant's second suppression motion. Defendant moves the Court to suppress all evidence obtained from the search of the Vehicle, arguing that the warrantless search was made without Defendant's consent, and therefore was inappropriate. The United States Supreme Court's decision in Thornton v. United States, 541 U.S. 615 (2004), established the basic analysis for cases such as this. The Thornton Court held that:

> In New York v. Belton, 453 U.S. 454 (1981), we held that when a police officer has made a lawful custodial arrest of an occupant of an automobile, the Fourth Amendment allows the officer to search the passenger compartment of that vehicle as a contemporaneous incident of arrest. We have granted certiorari twice before to determine whether Belton's rule is limited to situations where the officer makes contact with the occupant while the occupant is inside the vehicle, or whether it applies as well when the officer first makes contact with the arrestee after the latter has stepped out of his vehicle. We did not reach the merits in either of those two cases. Arizona v. Gant, 540 U.S. 963, 124 S.Ct. 461 (2003) (vacating and remanding for reconsideration in light of State v. Dean, 76 P.3d 429 (2003))[3]; Florida v. Thomas, 532 U.S. 774 (2001) (dismissing for lack of jurisdiction). We now reach that question and conclude that Belton governs even when an officer does not make contact until the person arrested has left the vehicle.

Thornton, 541 U.S. at 617. Thus, under Thornton and Belton, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile," Belton, 453 U.S. at 460, even if the

---

[3]As the Court noted above, after the 2003 remand, Arizona v. Gant has again been appealed to the United States Supreme Court, and the Court's decision is pending. Supra fn. 1.

arrestee was not in the vehicle at the time. However, for <u>Thornton</u> to apply, the arrestee must share an appropriate spatial and temporal relationship to the car at the time of the arrest. <u>Thornton</u>, 541 U.S. at 622.

Neither the United States Supreme Court nor the Sixth Circuit have addressed the upper limits of the acceptable temporal and spatial relationship between a defendant and his or her vehicle, however, other courts have held that distances of a block or more are too great for <u>Thornton</u> to apply. Specifically, the United States District Court for the District of Columbia has held that:

> <u>Thornton</u> never laid down an absolute rule declaring that any recent contact with a vehicle brings that vehicle within an arrestee's immediate control per se; it did not hold that a vehicle search is justified as incident to arrest simply because the arrestee is a "recent occupant." Searches conducted incident to arrest are excepted from the warrant requirement based upon the exigent circumstances presented by the inherently volatile nature of every arrest -- specifically, a concern for officer safety. <u>See</u> [Thornton, 541 U.S. at 620-21]. The fact that the [defendant's vehicle] was inaccessible to defendant in both theory and fact negates any assertion that the vehicle was searched in the interest of officer safety. The vehicle was located at least a block from where defendant was arrested -- indeed, it was out of the officers' line of vision -- and was parked in a private backyard, not on a street. Officer Jones had confiscated the only key from defendant, and defendant had already been handcuffed. It would stretch even the outermost boundaries of ordinary reason and logic for this Court to hold that, under such circumstances, the [vehicle] was within defendant's immediate control. Where, as here, the vehicle is not even theoretically within the immediate control of the arrestee, a search may not be justified under <u>Thornton</u> as incident to arrest

<u>United States v. Dubose</u>, No. 05-0372, 2006 U.S. Dist. LEXIS 21035, at *32-33 (D.D.C. Apr. 19, 2006). Similarly, the Ninth Circuit has held that the police could not search incident to arrest a vehicle belonging to a defendant who was arrested a block and half from the defendant's vehicle because "[u]nder the circumstances, there was no danger that [the defendant] could have used any

19

weapons in the car or could have destroyed any evidence inside the car, unless he 'possessed the skill of Houdini and the strength of Hercules.'" United States v. Caseres, 533 F.3d 1064, 1072 (9th Cir. Cal. 2008) (quoting Thornton, 541 U.S. at 626 (Scalia, J., concurring)). Though not binding, in the absence of Sixth Circuit jurisprudence on the issue, the Court finds these cases persuasive and adopts their rationale herein.[4]

In this instance, Defendant was arrested approximately two blocks away from the Vehicle. The arrest took place approximately five minutes after Defendant had left the Vehicle, and the officers returned Defendant to the Vehicle shortly after arresting him. The Court finds that while Defendant's temporal relationship with the Vehicle was appropriate under Thornton, his spatial relationship to the Vehicle was simply too great. Given the distance between Defendant and his Vehicle at the time of Defendant's arrest, the Court cannot find that a search of the Vehicle was appropriate under either a theory of officer safety or a concern for the preservation of evidence, the two bases for Thornton.

Nor has the government offered any evidence or argument providing any other legal basis in support of a warrantless search of the car. There is no evidence or argument that the Vehicle would have been seized by the police prior to the discovery of drugs, nor any evidence as to police policy regarding routine inventory searches prior to seizure, thus the government has not raised, and

---

[4]The Court is aware that there is a split of authority as to the scope of Thornton, and that some courts would appear willing to sanction the search of the Vehicle in the present case. See United States v. Richards, No. 2008-37, 2008 U.S. Dist. LEXIS 62943 (D.V.I. Aug. 15, 2008) (approving under Thornton a search of a vehicle when the driver was arrested an unspecified distance several buildings away); see, generally, United States v. Caseres, 533 F.3d 1064, 1071 (9th Cir. 2008) (describing the conflicting decisions reached by various courts as to the scope of Thornton). The Court, however, does not find this case law persuasive, as it ignores the rationale for Thornton, officer safety and the need to preserve evidence.

therefore cannot rely on, a theory of inevitable discovery to salvage the search at issue.  United States v. Musick, 291 Fed. App'x. 706, 721 (6th Cir. 2008) (recognizing the validity of a warrantless inventory search pursuant to standard police policy).  Nor can the Court find under the facts before it that the police had probable cause to search the Vehicle, which would have protected the search under the automobile exception to the warrant requirement.  See Md. v. Dyson, 527 U.S. 465, 467 (U.S. 1999) (describing the automobile exception).  The only basis for a finding of probable cause would be the fact that defendant was carrying $1,580 in cash and two cell phones, neither of which is sufficient under the totality of the circumstances to create probable cause for a warrantless search of the Vehicle.

Rather, based on the evidence before the Court, the Court finds that the government has not established a valid basis for performing a warrantless search of the Vehicle.  Accordingly, the Court finds that the search of the Vehicle was performed in violation of the Fourth Amendment, and therefore the evidence seized from the Vehicle should be suppressed.  The Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence [Doc. 30] be **GRANTED** and that all evidence seized from the Vehicle be suppressed.

## V.     SUMMARY

For the reasons set forth more fully above, the Court respectfully **RECOMMENDS** that

Defendant Jeffrey Lynn Mathis, Jr.'s Motion to Suppress Evidence Under the Fourth Amendment

of the United States Constitution [Doc. 30] be **GRANTED** and that Defendant's Motion to Suppress

Evidence Under the Fifth Amendment of the United States Constitution [Doc. 32] be **DENIED**.[5]

Respectfully submitted,

                    s/ H. Bruce Guyton
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).